UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Bulgartabac Holding AD**<br>**A Bulgarian Corporation,**<br><br>Plaintiff,<br><br>v.<br><br>**THE REPUBLIC OF IRAQ, NATIONAL TOBACCO STATE ENTERPRISE, THE CENTRAL BANK OF IRAQ, RAFIDAIN BANK**<br><br>Defendants. | Case No.  08-CV-6502 (RJH) |

## COMPLAINT

COMES NOW Plaintiff, Bulgartabac Holding AD, hereinafter referred to as "Bulgartabac" or "Plaintiff"), by and through undersigned counsel, and, pursuant to F.R. Civ. Proc. 7 and for a demand states and avers as follows:

### JURISDICTION AND VENUE

1. Jurisdiction is founded on 28 USC §§ 1330 and 1605(a) (2). Venue is proper pursuant to 28 USC § 1391(d) and (f)(1).

### NATURE OF THE CLAIM

**The Parties**

2. Plaintiff Bulgartabac is a joint-stock Company organized under the laws of the Republic of Bulgaria ("Bulgaria"). Bulgaria holds a majority interest in Plaintiff.

Prior to 1993, plaintiff was a wholly owned government entity operating under the name Bulgartabac. By order of the Council of Ministers No 115/10.11.1993 Bulgartabac was transformed into a sole-owned joint-stock company named Bulgartabac-Holding

EAD and in which Bulgaria owned 100 % interest in the capital. In June 1997 Bulgartabac-Holding EAD was transformed into Bulgartabac Holding AD. Plaintiff is the successor interest to Bulgartabac and to Bulgartabac-Holding EAD.

3.  Defendant the Republic of Iraq (hereinafter "Iraq") is a foreign state.

4.  Defendant National Tobacco State Enterprise ("NTSE") is an agency, agent or instrumentality of Iraq.

5.  Defendant Central Bank of Iraq ("CBI") is an agent, agency or instrumentality of Iraq and it does, engages in and transacts business in the State of New York, including business out of which this claim arises.

6.  Defendant Rafidain Bank ("Rafidain") is a commercial bank which has been wholly-owned by Iraq since 1988, and it does, engages in and transacts business in the State of New York, including business out of which this claim arises.

**Intergovernmental Undertakings**

7.  Pursuant to Article 3, paragraph (c) of the Foreign Trade Act (hereinafter "FTA"), in effect from 5th December 1969 – 13th January 1989, in Bulgaria, all foreign trade in Bulgaria was carried out under direct State management. The Bulgarian State held by law a monopoly on foreign trading.

8  The Bulgarian state held a monopoly on trade, import and export of tobacco and tobacco products pursuant to law from April 28, 1947 until November 30, 1993.

9  The Bulgarian tobacco monopoly was exercised by Bulgartabac as a state-owned company.

10. The Bulgarian Foreign Trade Bank ("BFTB") was at all times pertinent hereto a state-ownded and state-controlled bank in Bulgaria. In 1996, BFTB was renamed

BulBank. The successor in interest to BFTB and Bulbank does, transacts and engages in business in the city of New York.

11.     The Bulgarian state monopoly on foreign trade extended to foreign currency earned through foreign trade activities. Pursuant to Articles 19 and 20 of the FTA such foreign currency had to be deposited with BFTB only, and BFTB was the only bank authorized by Bulgarian law to make foreign currency purchase or sale transactions.

12.     Pursuant to Bulgaria's monopoly on foreign trade and foreign currency, Bulgaria established foreign trade relationships with Iraq in the intergovernmental Agreement for Economic and Technical Cooperation between the two states signed on 6th August 1967 (the "Bulgaria/Iraq 1967 Agreement").

13.     Pursuant to Article 9 of the Bulgaria/Iraq 1967 Agreement, a permanent Joint Bulgarian-Iraqi Committee was given responsibility for implementation of the Bulgaria/Iraq 1967 Agreement. Bulgaria and Iraq reached agreements and passed resolutions through a Joint Intergovernmental Bulgarian Iraqi Committee for Economic, Technical and Scientific Cooperation (hereinafter "JIBIC").

14.     Pursuant to an agreement, dated 20th July 1972, amending the Bulgaria/Iraq 1967 Agreement, payments due under or affected by under the Bulgaria/Iraq 1967 Agreement were to be made by, through and in care of BFTB for Bulgaria and the Central Bank of Iraq ("CBI") for Iraq.

15.     On or about July 1, 1986, BFTB and CBI entered into Bank Arrangement Nos 1 and 2.

16.     Bank Arrangement No. 1 provided that payments were to be made by means of irrevocable unconditional letters of credit (the "LOC's") opened by CBI or Rafidain Bank

at Bulbank in favor of the Bulgarian exporter, and it further provided for payment to be made at Credit Lyonnais in New York. CBI guaranteed payment.

17.   Bank Arrangement No. 2 provided that: payment shall be made through LOC's opened by CBI or Rafidain Bank, and that the LOC's would comply with the unified usual common practices for documentary Letters of Credit, brochure 400, revised edition of 1983 of the International Chamber of Commerce, Paris, France. CBI guaranteed payment.

18.   Bank Arrangement No. 2 was supplemented with an annex dated April 28, 1987. Pursuant to that annex, BFTB was required to maintain analytical accounts and was required to report to CBI the amounts paid to or in its accounts for supplies provided to Iraq by Bulgarian economic organizations, including Bulgartabac. CBI guaranteed payment.

19.   On July 1, 1986, BFTB and CBI entered into Bank Arrangement No 3. Pursuant to Banking Arrangement No. 3, all payments under the Bank Arrangements and the commercial contracts negotiated in convertible currency for payment of the export carried out by the Bulgarian economic organizations to be made through Credit Lyonnaiss in New York. CBI guaranteed payment.

20.   At all times pertinent hereto, the following conditions and arrangements, in addition to the conditions and agreements described above, existed with respect to payment for foreign trade, including the claims of plaintiff herein:

a.   Bulgarian currency -- the lev -- was not freely traded internationally. All foreign currency transactions in Bulgaria were required by law and necessarily conducted through BFTB/Bulbank.

b.  BFTB/Bulbank played a role in foreign trade contracts to the extent that those contracts required payments in foreign currency and BFTB/Bulbank;

c.  BFTB/Bulbank was the only Bulgarian financial institution with the capability to handle foreign currency transactions;

d.  In the 1980's, when foreign currency transactions were in American dollars, the Bulgarian state monopoly required that all foreign trade payments in American dollars were to be handled through American banks. Thereafter, funds were credited to the individual state owned corporate accounts held with BFTB/Bulbank for the government companies doing business abroad which had a foreign currency component;

e.  The payment arrangements for plaintiff were typical of the payment arrangements between Bulgarian companies and Iraq. Following approval by the Ministry of Finance, payments due in American dollars under these and other Bulgarian company contracts would be made thorough one of three or more United States banks: Credit Lyonnais-New York; Irving Trust Co.- New York; and, Morgan Guarantee Trust Co., New York. In plaintiff's case, Credit Lyonnais-New York was utilized. These US dollars payments from Iraq would then be transferred to the respective company bank accounts held at BFTB/Bulbank;

f.  When Iraq ceased payments through the American banks no further payments or credits were made to the Bulgarian company;

g.  The Bulgarian companies did not surrender their contract rights to BFTB/Bulbank, the Ministry of Finance or any other entity or government agency. The Bulgarian companies retained their rights to seek relief under the contract;

h.  BFTB/Bulbank, as a coordinate agency of the then Communist Bulgarian government, was serving as a foreign currency agent and intermediary on behalf of the

Bulgarian companies and Iraq pursuant to government to government banking arrangements, addendums, memorandums and joint sessions on execution of payment plans for the contracts; and

i.  All foreign currency contract payment arrangements, including payments due under the contracts in this case, were processed through BFTB/Bulbank. Those arrangements were described and modified in the various Banking Arrangements.

**The Contracts**

21.  During the Seventeenth and the Eighteenth JIBIC Sessions Bulgaria and Iraq, through their respective agencies, agents and representatives negotiated an agreement pursuant to which Bulgaria would export to Iraq in 1987 "Baghdad" and "Sumer" cigarettes (the "1987 JIBIC Agreement"). Pursuant to the 1987 JIBIC Agreement prices, delivery terms, shipping schedules and further delivery details were subject to subsequent individual agreements between the respective state agencies. True and accurate copies of the Minutes of the 17th session of 13the February 1986 and Minutes of the 18th session of 7th March 1987 are appended hereto as Exhibits A-1 and A-2, and are adopted and incorporated herein by reference as if specifically set forth herein.

22.  Pursuant to the 1987 JIBIC Agreement, defendant Iraq, with and through NTSE, entered into certain written contracts (hereinafter "Contracts") from 1986 to 1989 with Plaintiff for the purchase from Plaintiff of certain spare parts and tobacco articles, including, but not limited to, packaged cigarettes. True and accurate copies of the Contract of 5th November 1987 ( the "May 1987 Contract") and the Contract of 14th May 1987 ( the "November 1987 Contract," collectively with the May 1987 Contract the "Contracts") are annexed hereto as Exhibits B-1, and B-2 respectively, and are adopted and incorporated by reference as if specifically set forth herein.

23.    The Contracts were subject to final approval by the "high authorities of both parties" to the Contracts. Pursuant to Bulgarian law and administrative practice in 1987 and all other times relevant to the claims in this case, such approval was regularly given under seal, and such practice was followed with respect to the Contracts. The Contracts received the final approval from the high authorities of both parties to the Contracts.

24.    The Contracts required the parties to resolve amicably all disputes arising out of the Contracts.

25.    Pursuant to the May 1987 Contract, Iraq, through NTSE, was required to supply 5,000 tons of raw tobacco to plaintiff, and plaintiff was required to make and sell 4,300 tons of cigarettes of the "Baghdad" brand, as follows: 2,150 tons of cigarettes in hard packs and 2,150 tons of cigarettes in soft packs.

26.    Pursuant to the May 1987 Contract, the Contract FOB Price of the cigarettes was fixed at US$ 15,750,000.00 plus US$ 1,764,000.00 for shipping.

27.    Pursuant to the May 1987 Contract, payments would be made by way of LOC's with BFTB in favor of plaintiff. Payment was required to be made as follows: fifteen per cent (15 %) of the FOB value payable upon production of documents, and payment of the remaining eighty five per cent (85 %) ("the May 1987 Contract Payment Balance") to be made "in conformity with the conditions of the deferred payment stipulated in the Protocol signed on 13.02.86 between Iraqi and Bulgarian governments."

28.    Pursuant to the November 1987 Contract, plaintiff was required to deliver CIF 2000 tons of "BAGHDAD" cigarettes, which is equivalent to 10 million cartons, and 1000 tons of "SUMER" cigarettes, which is equivalent to 5 million cartons.

29.    Pursuant to the November 1987 Contract, the price to be paid by Iraq was as follows: "Baghdad" cigarettes at US$ 12,420,000.00 FOB and a further US$ 600,000.00

7

for freight; "Sumer" cigarettes – at the price of US$ 7,200,000.00 FOB and US$ 300,000.00 for freight.

30. Pursuant to the November 1987 Contract, payments would be made by way of LOC's with BFTB in favor of plaintiff. Payment was required to be made as follows: "BAGDAD" cigarettes: ten percent (10%) FOB upon production of documents, and the remaining 90% ( the November 1987 Contract Payment Balance") to be made "in conformity with the conditions of the deferred payment stipulated in the Protocol signed on 13.02.86 between Iraqi and Bulgarian governments."

**The LOC's**

31. Pursuant to the Contracts, the following LOC's were issued:

a. Letter of Credit 10/64620, dated January 9, 1988, Ref. No 4327272/к with Bulbank, issued by Rafidain Bank in favor of Bulgartabac, to confirm a cable dated December 27, 1987 for the amount of US$ 7,860,000.00 (the "January 1988 LOC"). True and accurate copies of the January 1988 LOC and accompanying invoices, are appended hereto as Exhibit C-1, and are adopted and incorporated herein by reference as if specifically set forth herein.

b. Letter of Credit 10/65427 dated November 29, 1988, Ref. No 20/05633 with Bulbank, issued by Rafidain Bank in favor of Bulgartabac, to confirm a cable dated November 23, 1988 for the amount of USD $69 874.00 (the "November 29 1988 LOC"). True and accurate copies of the November 29, 1988 LOC and accompanying invoices, are appended hereto as Exhibit C-2, and are adopted and incorporated herein by reference as if specifically set forth herein.

c. Letter of Credit 10/65428 dated 26.11.1988, Ref. No 20/09666 with Bulbank, issued by Rafidain Bank in favor of Bulgartabac to confirm a cable dated November 21,

1988 for the amount of US$78,489.40 (the "November 26, 1988 LOC"). True and accurate copies of the November 26, 1988 LOC and accompanying invoices, are appended hereto as Exhibit C-3, and are adopted and incorporated herein by reference as if specifically set forth herein.

d.  Letter of Credit 10/62346 dated October 7, 1985, Ref. No 1323160/к with Bulbank, issued by Rafidain Bank in favor of Bulgartabac, for the amount of US$1,962,450.00 (the "October 1985 LOC"). True and accurate copies of the October 1985 LOC and accompanying invoices, are appended hereto as Exhibit C-4 and are adopted and incorporated herein by reference as if specifically set forth herein.

e.  Letter of Credit 17/8318 dated 07.12.1986, Ref. No 4326339/к with Bulbank, issued by Rafidain Bank in favor of Bulgartabac, for the amount of US$78, 899.20 (the "December 1986 LOC"), payable under the conditions of deferred payment, pursuant to the provisions set out in the Bank Arrangements dated February 13, 1986 and July 1, 1986. True and accurate copies of the December LOC and accompanying invoices, are appended hereto as Exhibit C-5 and are adopted and incorporated herein by reference as if specifically set forth herein.

f.  Letter of Credit 17/8690 dated July 4, 1987, Ref. No 4326768 with Bulbank, issued by Rafidain Bank in favor of Bulgartabac, for the amount of US$ 15,750,000, payable under the following manner: (1) US$2,362,500, or 15 %, upon delivery; and, (2) US$ 13,387,500, or 85 %, plus the respective interest in compliance with the protocol, signed between the governments of both states on February 13, 1986 ( the "July 1987 LOC"). True and accurate copies of the July 1987 LOC and accompanying invoices, are appended hereto as Exhibit C-6 and are adopted and incorporated herein by reference as if specifically set forth herein.

g.  Letter of Credit 10/64621 dated January 12, 1988, Ref. No 4327275 with Bulbank issued by Rafidain Bank in favor of Bulgartabac, for the amount of US$13,020,000, payable under the following manner: (1) US$ 1,242,000.00, or 10 %, in cash upon due documents produced; and (2) US$ 11,178,000, or 90%, in compliance with the agreements for deferred payment signed between Bulgaria and Iraq (the "January 1988 LOC"). True and accurate copies of the January 1988 LOC and accompanying invoices, are appended hereto as Exhibit C-7, and are adopted and incorporated herein by reference as if specifically set forth herein.

**Performance and Non-Performance**

32.  Plaintiff delivered all contractually required shipments and fully performed according to the terms of the contracts. Plaintiff otherwise and in all respects fully performed pursuant to the terms of the Contracts.

33.  Notwithstanding notice and demand, defendants Iraq, NTSE, Rafidain and CBI have failed and refused to make the required payments.

34.  Iraq, NTSE, and CBI have failed and refused to make payments due under the Contracts.

35.  Iraq, NTSE, Rafidain and CBI have failed and refused to honor, pay under or take the steps necessary for payment under the LOC's. The following LOC's are unpaid:

a.  the January 1988 LOC in the unpaid amount of US$ 5, 998, 444.20;

b.  the November 29, 1988 LOC in the unpaid amount of US $69, 874.00;

c.  the November 26, 1988 LOC in the unpaid amount of US$ 53, 191.90;

d.  the October 1985 LOC in the unpaid amount of US $ 239, 378.80;

e.  the December 1986 LOC in the unpaid amount of US$ 72, 977.02;

f.  the July 1987 LOC, in the unpaid amount of US$ 12, 267, 375.19; and

g.    the January 1988 LOC, in the unpaid amount of US$ 11, 071, 142.,88.

36.    Partial payments were made to plaintiff by defendants Iraq and NTSE, by and through CBI into and through New York banks.

37.    Defendants Iraq and NTSE failed to make payments due under the Contracts, and such payments were due to be made into and through New York banks.

**The UN Embargo and Efforts at Amicable Resolution**

38.    Iraq invaded Kuwait on August 2, 1990.

39.    Pursuant to Resolution No 687 of the United Nations Security Council of April 2, 1991, an international embargo (the "Embargo") against Iraq was enacted effective August 6, 1990, and remained in effect through April 3, 1991, and was thereafter extended through 2003.

40.    Regularly and repeatedly after the imposition of UN sanctions, the Iraq Ministry of Foreign Economic Relations advised Bulgartabac in writing and otherwise, that an amicable resolution of plaintiff's claims under the Contracts could not be pursued until the Embargo was lifted, and that steps directed at an amicable resolution would commence upon the lifting of the Embargo, and that payments due by Iraq under the Contracts were suspended as result of the Embargo. CBI advised Bulbank that payments due under the agreements between Bulgaria and Iraq were suspended as a result of the Embargo.

41.    Upon the lifting of the Embargo, Bulgaria and Iraq entered into discussions directed at, *inter alia*, reaching an amicable resolution of the claims in this case. Plaintiff was advised that such discussions were taking place. Such discussions constituted efforts at amicable resolution as required by the Contracts. No earlier than November 2007, those discussions terminated without resolution of plaintiff's claims in this case.

42. Commencing in 2004, and concluding in March 15, 2008, Iraq, through the Iraq Debt Reconciliation Office ("IDRO"), initiated initiated a procedure under which creditors such as plaintiff could amicably discuss and potentially resolve their claims. Iraq, through its representative, has characterized the IDRO procedure as a procedure for resolving debt claims against Iraqi public sector entities.

43. Pursuant to the terms of the Contracts, plaintiff has sought an amicable resolution of its claims. No amicable resolution has been reached.

44. As a result of breach of the Contracts, Plaintiff sustained actual, foreseeable and consequential damages in the amount of twenty-nine million seven-hundred seventy two thousand three-hundred eighty three U.S. dollars and ninety-nine cents (US$29,772 383.99), plus accrued interest.

**Sovereign Immunity**

45. The Contracts and performance thereunder, were commercial activities.

46. The LOC's and performance thereunder were commercial activities.

47. This action is based on commercial activities carried on in the United States, and upon an act or acts performed in the United States in connection with commercial activities in Iraq and Bulgaria, and upon an act or acts in connection with a commercial activity in Iraq and Bulgaria which had a direct effect in the United States.

## COUNT ONE

### (Breach of Contract – Iraq, NTSE, CBI)

48. Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through forty-seven of the Complaint.

49. Plaintiff performed in full pursuant to the Contracts.

50. Despite repeated notice and demand, defendants Iraq and NTSE failed and refused to make payment as required by the Contracts.

51. The losses sustained by Plaintiff were the result and the consequence of breach by Iraq and NTSE of the contract terms and non payment for good tendered thereunder.

52. Unpaid contract amounts are due to be paid to Plaintiff by defendants Iraq, NTSE and CBI pursuant to the Contracts and the LOC's.

53. The failure to pay is a material breach of the Contracts.

54. As a direct, foreseeable and consequential result of that breach, Plaintiff has sustained injury and damage, in the amount of twenty-nine million seven-hundred seventy-two thousand three-hundred eighty-three United States dollars and ninety-nine cents ($29,772 383.99), plus accrued interest.

## COUNT TWO

### (Breach of Contract – Iraq, NTSE, CBI)

55. Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through fifty-four of the Complaint.

56. Plaintiff is the third party beneficiary of agreements reached between Iraq and Bulgaria with respect to payment of Iraq's obligations for certain commercial undertakings and agreements, including the Contracts.

57. The Contracts, and plaintiff, were among the class of undertakings, agreements, and parties, for whose benefit the agreements between Iraq and Bulgaria were made.

58. Pursuant to the agreements between Iraq and Bulgaria, Iraq, NTSE and CBI were required to make payments pursuant to the Contracts and pursuant to the LOC's.

59. Despite repeated notice and demand, defendants Iraq, NTSE and CBI failed and refused to make payment as required by the Contracts.

60. The losses sustained by Plaintiff were the result and the consequence of breach by Iraq, NTSE and CBI of the contract terms and non payment for good tendered thereunder, and non-payment under the LOC's.

61. Unpaid contract amounts are due to be paid to Plaintiff by defendants Iraq, NTSE and CBI pursuant to the Contracts, the LOC's, and the agreements between Iraq and Bulgaria..

62. The failure to pay is a material breach of the Contracts and the agreements between Iraq and Bulgaria.

63. As a direct, foreseeable and consequential result of that breach, Plaintiff has sustained injury and damage, in the amount of twenty-nine million seven-hundred seventy-two thousand three-hundred eighty-three United States dollars and ninety-nine cents ($29,772,383.99), plus accrued interest.

## COUNT THREE

### (Dishonor of LOC's – Iraq, NTSE, CBI, Rafidain Bank)

64. Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through sixty-three of the Complaint.

65. Defendants Iraq, NTSE and CBI agreed to make payments due under the Contracts pursuant to the LOC's.

66. Defendants Iraq, NTSE and CBI agreed to take all steps necessary to ensure that Payments were made under the LOC's.

67. Defendants CBI and Rafidain Bank agreed to pay and guaranteed payment under the LOC's.

68. Plaintiff complied in full with all of the requirements of the LOC's.

69. Notwithstanding performance, tender and demand, defendants Iraq, NTSE, CBI and Rafidain Bank failed to honor or pay pursuant to the LOC's.

70. The failure to honor or pay the LOC's is a material breach of the Contracts and the agreements between Iraq and Bulgaria.

71. As a direct, foreseeable and consequential result of that breach, Plaintiff has sustained injury and damage, in the amount of twenty-nine million seven-hundred seventy-two thousand three-hundred eighty-three United States dollars and ninety-nine cents ($29,772,383.99), plus accrued interest.

WHEREFORE, by all these presents, counsel for plaintiff demands:

1. Judgment in the amount of twenty-nine million seven-hundred seventy-two thousand three-hundred eighty-three United States dollars and ninety-nine cents ($29,772,383.99), in favor of Plaintiff and against defendants.

2. An award of prejudgment interest.

3. An award of post-judgment interest.

4. An award of the costs of this action.

5. Such other relief as may be just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable, as to those defendants subject to trial by jury.

Respectfully submitted,

*[signature]*

Sylvia J. Rolinski SR 7798
Danielle M. Espinet DE 0041
*Rolinski & Suarez, LLC*
305 Main Street
Gaithersburg, Maryland 20878
*Voice:* (301) 987-0202
*Fax:* (301) 987-0295
*Email:* srolinski@rolinski.com