UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BULGARTABAC HOLDING AD,

                Plaintiff,

- against -

THE REPUBLIC OF IRAQ,
NATIONAL TOBACCO STATE ENTERPRISE,
THE CENTRAL BANK OF IRAQ, &
RAFIDAIN BANK,

                Defendants.

1:08-cv-06502-RJH

**MEMORANDUM OPINION AND ORDER**

Richard J. Holwell, District Judge:

      In this action, plaintiff Bulgartabac Holding AD seeks to recover on two contracts for the sale of cigarettes that its predecessor in interest entered into with agencies of the Republic of Iraq before the first Gulf War. Three of four defendants have moved to dismiss the action on the grounds that they are immune from suit under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 (2006) ("FSIA" or the "Act"), and the action is time-barred. Bulgartabac contends that this Court has jurisdiction, because defendants undertook to pay it through the Bulgarian Foreign Trade Bank ("BFTB" or "Bulbank") in New York. Bulgartabac further contends that its cause of action did not accrue until 2007, and, alternatively, that the statute of limitations was equitably tolled by statements made by the Iraqi defendants during the thirteen-year international embargo against Iraq that commenced in 1990.

      For the reasons that follow, the Court finds that Bulgartabac has made a sufficient jurisdictional showing to survive defendants' motion to dismiss. The Court, however,

agrees with defendants that the action is not timely. Accordingly, defendants' motion to dismiss will be granted on non-jurisdictional grounds.

## I.     BACKGROUND

Plaintiff is a holding company and the successor in interest to the former Bulgarian state tobacco company, Bulgartabac. (Compl. ¶ 2.) Moving defendants are the Republic of Iraq, the Central Bank of Iraq ("CBI"), and Rafidain Bank ("Rafidain"). As the Second Circuit has noted previously, CBI is Iraq's central banking authority and is analogous to the Federal Reserve in the United States. *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 239 (2d Cir. 1994) ("*Rafidain I*"). Rafidain is a commercial bank that is wholly owned by the Republic of Iraq. *Id.* Both CBI and Rafidain are "agenc[ies] or instrumentalit[ies] of a foreign state" under the FSIA. *Id.*; *see* 28 U.S.C. § 1603(b).[1]

Bulgartabac's claims against these defendants arise out of four layers of agreements that it or other Bulgarian entities entered into with agencies of the Republic of Iraq in the 1980s. The agreements are not easy reading. But to understand the jurisdictional issues raised by defendants' motion, it is necessary to consider each of them in some detail.

### A.     Layer One: Framework Agreements of the Bulgarian-Iraqi Joint Committee for Economic, Scientific, and Technical Cooperation

The first layer of agreements consists of two agreements entered into by the Bulgarian and Iraqi contingents of the Joint Bulgarian-Iraqi Committee for Economic,

---

[1] The parties dispute whether proper service has been effected on the remaining party, the National Tobacco State Enterprise. (*Compare* Iraq Mem. 1 n.1 *with* Bulgartabac Mem. 1 n.1.) In view of the Court's disposition of this motion, it is not necessary to address this issue.

Scientific, and Technical Cooperation.  In February 1986, the Joint Committee met in Baghdad.  (*See* Compl. Ex. A1, at 1.)  According to the meeting's minutes, the committee agreed that certain exports from Bulgaria to Iraq would be paid for on a deferred basis. "List A," appended to the minutes, identifies "[p]rojects to be implemented by Bulgarian organizations in Iraq on deferred payment basis."  (*Id.* at 4.)[2]  "List B" identifies "Bulgarian goods oriented for exportation to Iraq on a deferred payment basis," including "[t]obacco," "[c]igarette Baghdad brand," and "[o]ther brands of cigarettes."  (*Id.* at 5.) The final list, which is unlabelled, identifies "Bulgarian goods oriented for exportation to Iraq on a deferred use basis."  (*Id.* at 6.)

In March 1987, the Joint Committee met in Sofia, Bulgaria.  (*See* Compl. Ex. A2, at 1.)  According to a "Protocol" signed during this meeting, the Bulgarian and Iraqi contingents expressed their satisfaction with the results achieved during the prior year. They felt that wider opportunities existed for future cooperation.  (*Id.*)

**B.     Layer Two: "Banking Arrangements" Implementing the Framework Agreements**

The second layer of agreements consists of three "banking arrangements" implementing the Joint Committee's February 1986 agreement that payments for certain exports from Bulgaria to Iraq would be made on a deferred basis.  Each arrangement was entered into by Bulbank and CBI, was signed on July 1, 1986, and specified that it would remain valid "until the final settlement of all obligations, ensuing there[from]."  (Compl. Ex. D, at 1, 6; Compl. Ex. E [Weaver], at 1, 6; Compl. Ex. E [Pl.'s Exs.], at 1, 6.)[3]

---

[2] The agreements contain many spelling and grammar errors.  Unless noted, the Court reprints the text of the agreements verbatim.

[3] Plaintiff did not originally file exhibits to the complaint, thus Banking Arrangement No. 2 appears as Exhibit E to plaintiff's exhibits in opposition to defendants' motion (Docket

The banking arrangement most directly relevant to this action is "Banking Arrangement No. 3." This agreement governed the timing of payments to certain Bulgarian exporters. It applied to "all payments due or which will fall due to the Bulgarian side in Convertible Currency during . . . 1986 under all existing Civilian and special Banking Arrangements and commercial Contracts . . . ." (Compl. Ex. E [Weaver], at 1-2.)

Two provisions of the agreement relate to how and where CBI was to pay Bulbank. First, article 1 establishes a payment schedule for export contracts within the scope of the agreement. It provides:

> [A]ll payments due or which will fall due to the Bulgarian
> side in Convertible Currency during . . . 1986 under all
> existing Civilian and special Banking Arrangements and
> commercial Contracts shall be settled as follows:
>
> A.    50% shall be paid in 1986 in accordance with relevant
> Contracts and Banking Arrangement.
>
> B.    50% shall be paid one year from the dates of maturity
> in accordance with relevant contracts and Banking
> Arrangements.
>
> C.    Deferred payments bear simple interest rate of 5
> (Five) percent annum.

(*Id.* at 1-2.)

Second, article 3 specifies how payments under contracts within the scope of the agreement are to be effected. It provides:

> "BulBank" shall send to (CBI) monthly [estimates] of the
> deferred payments.
>
> "CBI" shall confirm them or shall advise its remarks if
> any, within 30 days from their receipt.

---

No. 18), while Banking Arrangement No. 3 appears as Exhibit E to the Declaration of Andrew Weaver, dated January 21, 2009 (Docket No. 13). To maintain consistency with the complaint, the Court references both arrangements as "Exhibit E," indicating parenthetically the filing to which the exhibit was attached.

- 4 -

```
On the respective maturity dates, "CBI" shall credit the
Accounts of "BulBank" with Credit Lyonnais, New - York, in
convertible US. Dollars with amounts of due payments
mentioned in article 1 above plus their interest, advising
Simultaneously the "BulBank" by telexes.
```

(*Id.* at 3-4.)

### C.    Layer Three: Cigarette Contracts

The third layer of agreements consists of two contracts entered in May and November 1987 for the manufacture of cigarettes. These contracts are governed, at least in part, by Banking Arrangement No. 3. They created the obligations Bulgartabac is now seeking to enforce.

In the May 1987 contract, Bulgartabac agreed to produce cigarettes for the National Tobacco State Enterprise ("NTSE"). NTSE was to supply Bulgartabac with 5,000 tons of raw tobacco. Bulgartabac, in turn, would use the tobacco to produce 4,300 tons of BAGHDAD brand cigarettes. (Compl. Ex. B1, at 1.)

Section VI of the contract specified payment terms. It provides that "[p]ayment of the cigarettes will be effected by irrevocable L/C [letters of credit] opened with the Bulgarian Foreign Trade Bank [Bulbank] in favour of the Seller [Bulgartabac]." Fifteen percent of the FOB value of the cigarettes was to be paid upon presentation of documents conforming to the letters credit, and the remaining eighty-five percent was to be paid "in conformity with the conditions of the deferred payment stipulated in the Protocol signed on 13.02.1986." (*Id.* at 2-3.) [4] In other words, eighty-five percent of the principal amounts due under contract was to be paid according to the February 1986 minutes of the Joint Committee, as implemented by Banking Arrangement No. 3.

---

[4] In mercantile contracts, "FOB" or "free on board" generally means that the seller must clear the goods for export, and the buyer must arrange for transportation. *Black's Law Dictionary* 737 (9th ed. 2009).

- 5 -

Bulgartabac's counterparty in the November 1987 contract was the Iraqi State Enterprise for Tobacco and Cigarettes ("SETC"). The complaint does not disclose whether this entity is related to NTSE. Under the agreement, SETC agreed to buy 2,000 tons of BAGHDAD brand cigarettes and 1,000 tons of SUMER brand cigarettes from Bulgartabac. (Compl. Ex. B2, at 1.)

Section VIII specified payment terms. All payments by SETC were to be effected by irrevocable letters of credit opened with Bulbank in Sofia. (*Id.* at 3.) With respect to BAGHDAD cigarettes, the section specified three payments terms: (i) ten percent of the cigarettes' FOB value would be payable in cash upon presentation of "respective documents," an apparent reference to the letters of credit opened with Bulbank; (ii) the remaining ninety percent of the cigarettes' value would be payable "in conformity with the conditions of the deferred payment stipulated in the Iraqi-Bulgarian agreement," an apparent reference to the February 1986 minutes or the March 1987 protocol; and (iii) transport charges would be payable by SETC upon presentation of documents conforming to a separate letter of credit established at Bulbank for such charges. (*Id.*)

With respect to SUMER cigarettes, 100% of the purchase price was payable "according to the conditions of a-one-year deferred payment at a 5% annual interest rate," the terms of which were not further specified. (*Id.*) Transport charges would be payable in cash "upon presentation of documents for each shipment," again via a separate letter of credit established at Bulbank in favor of Bulgartabac. (*Id.*)

### D.  Layer Four: Letters of Credit

The final layer of agreements consists of five letters of credit issued by Rafidain Bank between 1987 and 1988.[5]  Each credit was issued in favor of Bulgartabac and provided in its preamble that it was payable in Bulgaria.  Bulbank acted as the advising bank.

The credit most directly relevant to this motion is No. 17/8690, which issued on July 4, 1987.  (Compl. Ex. C6.)  Like the other credits, No. 17/8690 provides that it is "available for payment (in BULGARIA)."  However, ¶ 12(k), "Payment instructions," specifies two further terms concerning how Bulgartabac was to be paid: first, "15% of the value of each delivery will be paid cash upon negotiation of documents by Bulbank in conformity with L/C terms"; second, and critically, the "remaining 85% together with relevant interest will be paid according to the protocol signed between Bulgarian and Iraqi governments on 13-2-1986."  (*Id.* at 2 (capitalization normalized).)  Thus, this letter of credit, like the May 1987 cigarette contract, contemplates that eighty-five percent of the value of the cigarettes is to be paid in conformity with the deferred payment agreement memorialized in Banking Arrangement No. 3.

A separate section of the credit, ¶ 9, specifies how Rafidain will reimburse Bulbank for payments made under the credit.  It provides: "In reimbursement of your payment, against documents in conformity with the terms of this letter of credit . . . Draw on our account with Irving Trust Co, N.Y, U.S.A., asking them to quot[e] our branch name[,] branch number[,] and credit number in their debit advice."  (*Id.* at 1.)

---

[5] Two additional credits attached to the complaint expired before the cigarette contracts were entered into.  (*See* Compl. Ex. C4, at 1; Compl. Ex. C5, at 1.)

A large number of invoices that appear to conform to the credits is attached to the complaint.

**E.    Procedural History**

Bulgartabac filed its complaint on July 22, 2008.

On the question of jurisdiction, the complaint begins by describing the Bulgarian government's monopoly on foreign trade during the period in which the cigarette contracts were entered into. At this time, all foreign trade was carried out under the direct management of the Bulgarian government. (Compl. ¶ 7.) Currency earned through foreign trade had to be deposited with Bulbank, and Bulbank was the only bank authorized to enter into transactions for the purchase or sale of foreign currency. (¶¶ 10, 11.) The complaint alleges that, in essence, Bulbank acted as a passive conduit for funds due to Bulgarian exporters. After a foreign counterparty deposited a payment with Bulbank, Bulbank credited the state-owned corporate account for the government entity doing business abroad. (¶ 20(d).)

The complaint alleges that the cigarette contracts operated within this general framework, and that the Iraqi defendants breached the contracts by failing to pay for cigarettes received.[6] (¶¶ 20(i), 33).) Thus when the Iraqi defendants stopped making payments to Bulbank in New York, Bulgartabac received no further payments or credits from Bulbank. (¶ 20(f).) The complaint states three claims, for breach of contract,

---

[6] The complaint vaguely refers to "certain written contracts . . . for the purchase from Plaintiff . . . of certain spare part and tobacco articles, including, but not limited to, packaged cigarettes." (¶ 22.) Because the complaint does not plead the terms of any contracts except the May and November 1987 cigarette contracts, the Court limits its consideration to these two contracts. *See* Fed. R. Civ. P. 8(a) (complaint must contain short and plain statement of claim showing pleader is entitled to relief).

breach of contract as a third-party beneficiary, and breach of the letters of credit. As relief, it demands damages of approximately $30 million, plus interest. (Compl. 15.)

The Iraqi defendants moved to dismiss the complaint, arguing that insofar as the cigarette contracts are concerned, they are immune from suit in the United States. Defendants additionally argued that even if they are not immune from suit, Bulgartabac cannot, at this late date, bring claims on the cigarette contracts. (Iraq Mem. 19-21.)

## II.   DISCUSSION

The Court first considers whether Bulgartabac has made a sufficient showing of subject matter jurisdiction to withstand defendants' motion to dismiss, then turns to the timeliness of this action. *See, e.g.*, *Florida v. Thomas*, 532 U.S. 774, 777 (2001).

### A.   The Statutory and Procedural Framework

The FSIA provides the "sole basis" for obtaining jurisdiction over a foreign state or its agencies and instrumentalities in the United States. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Under the Act, a foreign state is presumptively immune from suit in U.S. court unless an action against it falls within one of several statutory exceptions. 28 U.S.C. § 1604; *see* §§ 1605(a)-(d). The only exception pertinent to this case is the "commercial activity" exception defined in § 1605(a)(2), which "largely codifies the so-called 'restrictive' theory of foreign sovereign immunity first endorsed by the State Department in 1952." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612 (1992). In relevant part, this provision provides that,

> [a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based upon . . . an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States . . . .

28 U.S.C. § 1605(a)(2).  A foreign state is subject to suit under this provision if: (i) it engaged in an act "in connection with a commercial activity," (ii) the act caused a direct effect in the United States, and (iii) the plaintiff's suit is "based on" the act.  § 1605(a)(2); *cf. Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 388 (2d Cir. 2000) ("This exception contains two requirements: (1) there must be an act outside the United States in connection with a commercial activity of the foreign state that causes a direct effect in the United States and (2) the plaintiff's suit must be based upon that act.").

In the leading case on the circumstances in which non-payment of a commercial obligation causes a "direct effect" under § 1605(a)(2), the Supreme Court held that Argentina's unilateral rescheduling of certain bond obligations satisfied this standard.  *See Weltover*, 504 U.S. at 619.  The Court explained that "[a]n effect is direct if it follows as an immediate consequence of the defendant's . . . activity."  *Id.* at 618.  Because Argentina undertook to make payments in New York, its default caused such an effect in this country:  "Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming."  *Id.* at 619.  Courts have held in subsequent cases that non-payment of a commercial obligation has a "direct effect" in the United States if the operative agreements call for performance here, or if the agreements permit a party to elect U.S. performance, and the party elects such performance.  *See, e.g.*, *Hanil Bank v. PT. Bank Negara Indonesia (Persero)*, 148 F.3d 127, 132-33 (2d Cir. 1998); *Rafidain I*, 15 F.3d at 241; *Dar El-Bina Eng'g & Contracting Co., Ltd. v. Republic of Iraq*, 79 F. Supp. 2d 374, 382 (S.D.N.Y. 2000) (Kaplan, J.).

In *Saudi Arabia v. Nelson*, 507 U.S. 349 (1993), the Court considered the circumstances in which a lawsuit is "based on" a foreign state's activities in the United States. It held that to satisfy this condition, the foreign state's activities must be "elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Id.* at 357. *Nelson* did not explicitly consider when a suit is "based on" "an act outside the territory of the United States in connection with a commercial activity of the foreign state [that] causes a direct effect in the United States." But following its reasoning, courts have held that § 1605(a)(2)'s "direct effect" clause "requires a degree of closeness between the acts giving rise to the cause of action and those needed to establish jurisdiction that is considerably greater than common law causation requirements." *Transatlantic Shiffahrtskontor*, 204 F.3d at 390. *See, e.g.*, *Hanil Bank*, 148 F.3d at 133 ("legally significant acts" must take place in United States); *Rafidain I*, 15 F.3d at 241 ("material connection" required between cause of action and "commercial activity" that forms jurisdictional basis of suit); *Federal Ins. Co. v. Richard I. Rubin & Co., Inc.*, 12 F.3d 1270, 1286 (3d Cir. 1993) ("substantive connection or nexus" required between "subject matter of the cause of action" and commercial activity).

Procedurally, courts employ a series of burdens of production and persuasion to adjudicate claims of immunity under the FSIA. The Second Circuit recently summarized these burdens as follows:

> In a motion to dismiss for lack of subject matter jurisdiction under the FSIA, the defendant must present a prima facie case that it is a foreign sovereign. The plaintiff then has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted. Determining whether this burden is met involves a review of the allegations in the complaint, the undisputed facts, if any, placed before the court by the parties, and—if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue—resolution of

>disputed issues of fact. The ultimate burden of persuasion remains with the alleged foreign sovereign.

*In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 80 (2d Cir. 2008) (citations, quotation marks, and alterations in original omitted). Thus, when a defendant is concededly a foreign state, the plaintiff bears an initial burden of showing that its action falls within a statutory exception to immunity; thereafter, the defendant bears the ultimate burden of establishing its immunity from suit. *Id.; Cargill International S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993) (same). A district court has the authority to order limited discovery on a jurisdictional issue if the plaintiff establishes (i) a reasonable basis for assuming jurisdiction, and (ii) that the defendant is a "foreign state" that has been served properly. *Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332-33 (2d Cir. 1990).

### B. Bulgartabac Has Carried its Initial Burden of Showing that this Action Falls Within Section 1605(a)(2)

Turning to this case, the Court finds that Bulgartabac has carried its initial burden of "going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." *In re Terrorist Attacks*, 538 F.3d at 80.

As described above, the complaint alleges that at the time the cigarette contracts were agreed to, all payments by foreign entities to Bulgarian exporters were remitted to Bulbank in New York. The Iraqi defendants acceded to this way of doing business, as evidenced by Banking Arrangement No. 3. And, they allegedly breached their obligation to make payments in New York after receiving cigarettes from Bulgartabac.

The documents attached to the complaint are far more ambiguous, but they provide some support for plaintiffs' basic contention that payments on the cigarette contracts were to be funneled through bank accounts in New York. Specifically:

- Banking Arrangement No. 3 establishes a deferred payment schedule for export contracts within its scope and provides that deferred payments are to be remitted in New York (Compl. Ex. E, at 1-2, 4-5);

- The May 1987 cigarette contract expressly references the framework agreement that Banking Arrangement No. 3 implements, thereby incorporating that agreement and, derivatively, Banking Arrangement No. 3 (Compl. Ex. B1, at 2-3; Compl. Ex. B2, at 3); and

- Letter of Credit No. 17/8690 provides that payment to Bulgartabac is to be paid "according to the protocol signed between [the] Bulgarian and Iraqi governments on 13-2-1986," another reference to the framework agreement implemented by Banking Arrangement No. 3 (Compl. Ex. C6, at 2).

Read together, these agreements provide some basis for plaintiffs' contention that the Iraqi defendants undertook to pay it in New York through Bulbank, a recognized basis for FSIA jurisdiction. *See generally Rafidain I*, 15 F.3d 238.

The Iraqi defendants riposte that this cannot be, because Bulbank in fact agreed to cover the Iraqi defendants' obligations on the understanding that it would be repaid by CBI at a later time. Citing a separate banking arrangement and *Agrocomplect, AD v. Republic of Iraq*, 524 F. Supp. 2d 16 (D.D.C. 2007), *aff'd* 304 F. App'x 872 (D.C. Cir. 2008), defendants contend that "any payments in the United States were necessarily made to *Bulbank*—not Bulgartabac—*after* Bulbank had paid on conforming documents presented by Bulgartabac in Bulgaria . . . ." (Iraq. Mem. 6.) As such, the required connection between plaintiffs' cause of action and a "direct effect" in this country is lacking. *See Transatlantic Shiffahrtskontor*, 204 F.3d at 390.

While this understanding of the Iraq defendants' payment obligations is plausible, it is hardly compelled by the transaction documents. The banking arrangement defendants rely on, Banking Arrangement No. 2, applies to "commodity lists A1 and A2" appended to the February 1986 minutes. (Compl. Ex. E [Pl.'s Exs.], at 1.) Yet

"[c]igarette Baghdad brand," "[o]ther brands of cigarettes," and "[t]obacco" appear on a separate list, List B. (Compl. Ex. A1, at 5.) Thus even if Banking Arrangement No. 2 is a financing agreement whereby Bulbank agreed to finance the Iraqi defendants' payment obligations, it provides no support for defendants' theory that Bulbank would cover their obligations only to be repaid at a later date.

Defendants' reliance on *Agrocomplect* is misplaced for much the same reason. In that case, the principal focus of the district court's analysis was yet another banking arrangement, Banking Arrangement No. 1. *See Agrocomplect*, 524 F. Supp. 2d at 27. Thus, the court did not resolve the issue raised by this case—whether Banking Arrangement No. 3 effectively modified the 1987 cigarettes contracts to require payment in New York to Bulbank as a collecting agent. Accordingly, the Court cannot say as a matter of law that under the contracts and Banking Arrangement No. 3, any payments in the United States necessarily were made to Bulbank after it paid Bulgartabac in Bulgaria.

## C. This Action Is Untimely

In the ordinary case, Bulgartabac's proffer of evidence that meets its burden of going forward would justify limited discovery directed at the question of how the Iraqi defendants undertook to pay Bulgartabac. The cigarette contracts and banking arrangements contain a number of seemingly contradictory provisions. Thus, parol evidence concerning the meaning of the agreements, as well as evidence concerning the parties' course of performance and course of dealing, would provide much-needed insight into whether defendants are subject to suit under § 1605(a)(2)'s direct-effect exception. *See generally Frigaliment Importing Co. v. B.N.S. Int'l Sales Corp.*, 190 F. Supp. 116 (S.D.N.Y. 1960). In this case, however, jurisdictional discovery would not serve any

purpose, because Bulgartabac's claims are independently barred by the statute of limitations.

In cases arising under the Constitution's grant of diversity jurisdiction, the applicable limitations period is supplied by state law. *Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 110 (1945); *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 707 (7th Cir. 2004); *Bournias v. Atlantic Maritime Co.*, 220 F.2d 152, 154 (2d Cir. 1955). The parties agree that Bulgartabac's claims are subject to the six-year statute of limitations applicable to breach-of-contract actions under New York's borrowing statute. (Iraq. Mem. 20; Bulgartabac Mem. 21-25; *see* N.Y. CPLR 202, 213 (McKinney 2008).) As a result, New York law also supplies the applicable tolling rules. *Walker v. Armco Steel Corp.*, 446 U.S. 740, 751 (1980); *Bertha Building Corp. v. Nat'l Theatres Corp.*, 269 F.2d 785, 788 (2d Cir. 1959). Tolling rules "intimately affect recovery or non-recovery," *Guaranty Trust*, 326 U.S. at 110, and thus are part of a state's "substantive law" under the doctrine of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).

Defendants contend that the limitations period began to run on April 24, 1989—nineteen years, two months, and twenty-eight days before Bulgartabac filed its complaint—when Bulgartabac mailed its final invoice. (Iraq Mem. 20-21.) At oral argument, Bulgartabac did not dispute that it mailed its final invoice on that date. Bulgartabac also noted that in 1991, Iraq repudiated its commercial obligations in response to the international embargo that began in 1990. *See generally* Security Council Res. 661, U.N. Doc. S/RES/0661 (Aug. 6, 1990). Nonetheless, Bulgartabac maintains that this action is timely for two reasons: first, because its cause of action did not accrue until amicable efforts to resolve its claims failed in 2007, and second, because the statute

of limitations was equitably tolled by representations made by the Iraqi defendants during the international embargo. (Bulgartabac Mem. 23, 25). Neither argument withstands scrutiny.

Bulgartabac's first argument presupposes that efforts at amicable resolution are a condition precedent to bringing a claim under the cigarette contracts, but the language of the contracts is inconsistent with this interpretation. The relevant section of the May 1987 contract provides that "[a]ll disputes which may arise out of the present contract will be solved amicably." The November 1987 contract provides that "[a]ll disputes which may arise out of the present contract will be settled amicably between the BUYER and the SELLER." Grammatically, these clauses do not say that suit on the contracts may not be commenced until settlement negotiations fail. They contain none of the language customarily used to create an express condition precedent to suit. *See generally* 8 Joseph M. Perillo, *Corbin on Contracts* § 31.1 (Supp. 2009). And it is fundamental that "[i]n determining whether a particular agreement makes an event a condition[,] courts will interpret doubtful language as embodying a promise or constructive condition rather than an express condition." *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995). Thus, even if Bulgartabac was obligated to attempt to resolve disputes under the contracts amicably, this did not prevent the limitations period from beginning to run in 1991 at the latest.[7]

In this regard, the Court agrees with the analysis of *Vogt-Nem, Inc. v. M/V Tramper*, 263 F. Supp. 2d 1226 (N.D. Cal. 2002), which considered language materially

---

[7] Conceivably, a different result might obtain under Bulgarian law. The parties, however, did not plead or prove the content of that law. Accordingly, the Court proceeds "on the assumption that the law of the foreign jurisdiction accords with that of New York . . . ." *Dar El-Bina Eng'g*, 79 F. Supp. 2d at 383 & n.77 (collecting sources).

indistinguishable from that in the cigarette contracts. The contract in *Vogt-Nem* provided: "Any disputes between [plaintiff] and [VWG] will be settled first amicably, but in case of disagreement it will be submitted to the competent court in Rotterdam." *Id.* at 1229 (alterations in original). The court noted the absence of "terms usually associated with conditions precedent" and reasoned that "[a]lthough the disputed clause could have been drafted more clearly, there is no 'plain, unambiguous language' indicating that attempted settlement is a condition precedent to resolution in a Dutch Court." *Id.* at 1232 (quoting *Southland Corp. v. Emerald Oil Co.*, 789 F.2d 1441, 1444 (9th Cir. 1986)). Accordingly, it rejected the argument that settlement negotiations were a condition precedent to maintenance of a suit on the contract.

As for the second argument, Bulgartabac contends that the statute of limitations was equitably tolled because "Iraq asserted that UN sanctions interfered with its ability to resolve the dispute, but promised to address the matter upon lifting of sanctions." (Bulgartabac Mem. 25.) Specifically, the complaint alleges that Iraq refused to pay amounts due under the contracts between August 6, 1990, and an unspecified date in 2003, during which time Iraq was subject to an international embargo:

> Regularly and repeatedly after the imposition of UN sanctions, the Iraq Ministry of Foreign Economic Relations advised Bulgartabac in writing and otherwise, that an amicable resolution of plaintiff's claims under the Contracts could not be pursued until the Embargo was lifted, and that steps directed at an amicable resolution would commence upon the lifting of the Embargo, and that payments due by Iraq under the Contracts were suspended as a result of the Embargo. CBI advised Bulbank that payments due under the agreements between Bulgaria and Iraq were suspended as a result of the Embargo.

(Compl. ¶ 40). The complaint continues to allege that unsuccessful settlement discussions took place after the embargo was lifted:

> Upon the lifting of the Embargo, Bulgaria and Iraq entered into discussions directed at, *inter alia*, reaching an amicable resolution of the claims in this case. Plaintiff was advised that such discussions were taking place. Such discussions constituted efforts at amicable resolution as required by the Contracts. No earlier than November 2007, those discussions terminated without resolution of plaintiff's claims in this case.

(Compl. ¶ 41.)

Taking these allegations as true, the Court sees no basis to equitably toll the statute of limitations. As Bulgartabac accurately notes, "the doctrines of equitable tolling or equitable estoppel may be invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." (Bulgartabac Mem. 24-25 (quoting *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007).) This statement of the law, however, makes clear that the sine qua non of equitable tolling is *inequitable* conduct that delays a plaintiff's initiation of suit. *Putter v. North Shore Univ. Hosp.*, 858 N.E.2d 1140, 1142 (N.Y. 2006); *Zumpano v. Quinn*, 849 N.E.2d 926, 929 (N.Y. 2006); *Dowdell v. Greene County*, 14 A.D.3d 750, 750 (N.Y. App. Div. 2005); *see* 1 Jack B. Weinstein, Harold L. Korn, & Arthur R. Miller, *New York Civil Practice: CPLR* § 201.13[4], at 2-32 (2009) ("[A] mere acknowledgment by the defendant that it is investigating, or may wish to negotiate a settlement, unaccompanied by any affirmative representations to the plaintiff, will not create an estoppel.").

Inequitable conduct is not alleged in the complaint. In particular, the complaint does not allege that defendants affirmatively misled plaintiffs during the international embargo of Iraq or the parties' subsequent settlement negotiations. In the absence of such allegations, the simple fact that the parties tried to settle the dispute does not create an estoppel; "equitable estoppel will not be applied 'merely on plaintiff's general expectation that the matter would be settled.'" Weinstein, *supra*, § 201.13[4], at 2-33

(quoting *Ryder v. Tannenbaum*, 494 N.Y.S.2d 950, 952 (Civ. Ct. 1985)); *see, e.g.*, *Academy Street Assocs., Inc. v. Spitzer*, 44 A.D.3d 592, 593 (N.Y. App. Div. 2007) (assurances that amendments to condominium offering plan would be timely addressed not affirmative wrongdoing such as would estop limitations defense); *Stark v. City of New York*, 31 A.D.3d 530, 531 (N.Y. App. Div. 2006) (settlement negotiations, allusions to future negotiations, and oral promises insufficient to estop defendant from asserting statute-of-limitations defense); *Marvel v. Capital Dist. Transp. Authority*, 114 A.D.2d 612, 612 (N.Y. App. Div. 1985) ("The mere fact that settlement negotiations have been ongoing between the parties is insufficient to justify an estoppel." (citations omitted)).

Bulgartabac responds, citing *Pearl v. Long Beach*, 296 F.3d 76 (2d Cir. 2002), that it is enough that "the defendant induce[d] plaintiff to forego suit until after the period of limitations has expired." (Bulgartabac Mem. 25.) But this over-reads *Pearl*. There, the Second Circuit held that four police officers' false testimony in a criminal case did not equitably toll the statute of limitations on a related damages claim under 42 U.S.C. § 1983, because the false testimony did not prevent the plaintiff from learning the facts of his cause of action. *Id.* at 85. In the passage most helpful to plaintiffs, the court observed that it had "broadly stated" that "we will apply the equitable tolling doctrine 'as a matter of fairness' where a plaintiff has been 'prevented in some extraordinary way from exercising his rights[.]'" *Id.* at 85. But the court immediately qualified this statement, explaining that it "had in mind a situation where a plaintiff 'could show that it would have been impossible for a reasonably prudent person to learn' about his or her cause of action" but for the defendant's misconduct. *Id.* (quoting *Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 24 (2d Cir. 1985)).

*Pearl* also cited a decision of the Supreme Court for Oneida County, *Croop v. Odette*, 219 N.Y.S.2d 805 (Sup. Ct. 1960), for the proposition that the "defendant's representation that compensation would be paid without need for lawsuit" created an estoppel. *Pearl*, 296 F.3d at 82. But in *Croop*, the defendant conceded liability only to later renege on its promise to pay. 219 N.Y.S.2d at 806. A Sixth Circuit case that Bulgartabac relies on involved similar facts. *See William H. Sill Mortgages, Inc. v. Ohio Cas. Ins. Co.*, 412 F.2d 341 (6th Cir. 1969). Although the defendant-insurer investigated the plaintiff's claim, it "lull[ed] the insured to sleep by . . . failure to deny liability until after the time limitation ha[d] expired and then set up as a defense the failure to bring the action within the limitation fixed by the policy." *Id.* at 346. The complaint does not allege similar conduct on the part of the Iraqi defendants.

Because plaintiff's arguments for extending the limitations period fail, this action is time-barred.

### III.   CONCLUSION

For the foregoing reasons, defendants' motion to dismiss **[12]** is granted.

SO ORDERED.

Dated: New York, New York
       September 30, 2009

Richard J. Holwell
United States District Judge

- 20 -